# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF CEDAR MESA,<br>567 W. Main St. (Highway 191),<br>Bluff, UT 84512,<br><br>      Plaintiff,<br><br>      v.<br><br>DEPARTMENT OF THE INTERIOR,<br>1849 C Street, N.W.<br>Washington, DC 20240,<br><br>BUREAU OF LAND MANAGEMENT,<br>760 Horizon Drive<br>Grand Junction, CO 81506,<br><br>      and<br><br>KENT HOFFMAN, in his official capacity as<br>Deputy State Director, Division of Lands and<br>Minerals, BLM Utah State Office,<br>440 West 200 South, Ste. 500,<br>Salt Lake City, UT 84101,<br><br>      Defendants. | Case No. 21-cv-971<br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

COMPLAINT - 1

## INTRODUCTION

1.      This case challenges Federal Defendants' decision to offer 32 oil and gas leases[1]

in a culturally rich and sacred landscape in southeastern Utah, without proper study and

acknowledgement of the likely harms to historic, cultural, and natural resources.

2.      The lease parcels include some of our Nation's most significant archaeological

resources. Diverse peoples and cultures have inhabited and traversed these lands for at least

9,000 years and left well-preserved evidence of their activities in the form of cliff dwellings,

pueblos, kivas, petroglyph and pictograph panels, ancient roads, and Chaco-era (circa 900-1150

A.D.) "great houses." Over 1,336 ancient sites have been recorded within the lease parcels, 1,085

of which have been deemed eligible for listing on the National Register of Historic Places—this

despite the fact that very limited scientific study has been undertaken in the area. Numerous

indigenous tribes consider these sites sacred.

3.      The Bureau of Land Management (BLM) itself has acknowledged that this

landscape contains some of the highest archaeological site densities in North America. Jim

Allison, a well-respected archaeologist and professor at Brigham Young University who has

---

[1] The challenged leases include: UTU-93016 (March 2018, Parcel 28), UTU-93017 (March
2018, Parcel 29), UTU-93018 (March 2018, Parcel 30), UTU-93019 (March 2018, Parcel 31),
UTU-93020 (March 2018, Parcel 32), UTU-93021 (March 2018, Parcel 33), UTU-93022 (March
2018, Parcel 34), UTU-93023 (March 2018, Parcel 36), UTU-93024 (March 2018, Parcel 37),
UTU-93025 (March 2018, Parcel 38), UTU-93026 (March 2018, Parcel 39), UTU-93027 (March
2018, Parcel 40), UTU-93028 (March 2018, Parcel 41), UTU-93029 (March 2018, Parcel 42),
UTU-93030 (March 2018, Parcel 43), UTU-93031 (March 2018, Parcel 44), UTU-93032 (March
2018, Parcel 47), UTU-93033 (March 2018, Parcel 48), UTU-93034 (March 2018, Parcel 49),
UTU-93035 (March 2018, Parcel 50), UTU-93036 (March 2018, Parcel 51), UTU-93722
(December 2018, Parcel 301), UTU-93728 (December 2018, Parcel 324), UTU-93729
(December 2018, Parcel 325), UTU-93730 (December 2018, Parcel 326), UTU-93731
(December 2018, Parcel 327), UTU-93733 (December 2018, Parcel 329), UTU-93742
(December 2018, Parcel 360), UTU-93743 (December 2018, Parcel 361), UTU-93744
(December 2018, Parcel 362), UTU93746 (December 2018, Parcel 364), UTU93747 (December
2018, Parcel 365).

worked extensively in the region, also said of the lease area:

> I don't know any other place in the world where you could go out and walk
> carefully along a square mile of ground and find 100 sites. . . . There are so many
> sites, it would take an army of archaeologists decades to map them. . . . We know
> enough to say site densities are so high [that] they shouldn't do oil and gas
> extraction there.

Jennifer Oldham, *Countless archaeological sites at risk in Trump oil and gas auction*,

Reveal News (Mar. 8, 2018).

4.      In addition to preserving a vital record of human history, this region is also a

burgeoning recreation destination, known for its scenic vistas, colorful sandstone cliffs, twisting

canyons, and diversity of plant and animal life. Numerous national monuments and landmarks—

including Bears Ears, Hovenweep, and Canyons of the Ancients National Monuments; and

Alkali Ridge National Historic Landmark—sit on the doorstep of the lease area and evidence its

national importance.

5.      Oil and gas leasing will have significant, irreparable impacts on this landscape.

Standard lease terms grant companies the right to explore for oil or gas for a minimum of ten

years and extract indefinitely if the lease is producing. Without proper mitigation measures in

place, energy leasing and development can directly and indirectly impact sensitive cultural and

natural resources. Ground clearing and grading can disturb buried archaeological materials and

wildlife habitat. Industrial traffic and ground clearing can increase dust particulates that degrade

fragile rock imagery panels. Construction of new access roads can increase site visibility and

accessibility, leading to increased vandalism, looting, and accidental disturbance of historic

resources. The sights and sounds of drill rigs, pumpjacks, compressor facilities, and pipelines

also impact the setting, feeling and association of historic sites, which are protected by NHPA—

and compromise the eligibility of sites for listing on the National Register of Historic Places.

6.    Making matters worse, only a small portion of the lease area has ever been surveyed for cultural resources, meaning that thousands of significant sites remain undocumented. BLM itself has previously acknowledged these risks and deferred leasing in this region to avoid cultural resources impacts.

7.    Despite the obvious potential for adverse impacts, extraordinary concentration of sensitive resources, and lack of rigorous professional survey of this landscape, BLM concluded that the March and December 2018 Lease Sales and ensuing development have no potential to adversely affect cultural resources or to significantly impact the surrounding environment.

8.    In reaching this conclusion, BLM relied on arbitrary, capricious, and legally inadequate efforts to identify, study, and document the potential impacts to cultural and environmental resources, in violation of the National Historic Preservation Act (NHPA), National Environmental Policy Act (NEPA), Administrative Procedure Act (APA), Endangered Species Act (ESA), and their implementing regulations. BLM also failed to consider reasonable alternatives that would defer or apply protective stipulations to the most sensitive lease parcels, in violation of NEPA and the APA.

9.    Accordingly, Plaintiff Friends of Cedar Mesa asks this Court to hold unlawful and set aside Defendants' approval of the March and December 2018 Lease Sales, and reverse and set aside the unlawful oil and gas leases.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540 (Endangered Species Act), and 5 U.S.C. §§ 553, 702, and 706.

11.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

12.     Plaintiff has exhausted all required administrative remedies and provided BLM notice of its Endangered Species Act violation more than 60 days prior to filing this lawsuit.

13.     Venue in the District of Columbia is appropriate under 28 U.S.C. § 1391(e)(1)(A) because defendant U.S. Department of Interior is an agency of the United States with its primary office in Washington, D.C.

## PARTIES

14.     Plaintiff FRIENDS OF CEDAR MESA is a non-profit organization based in Bluff, Utah dedicated to the protection of natural and historic resources on the public lands in southeast Utah. Formed in 2010 by a former BLM ranger, Friends of Cedar Mesa works to ensure that the public lands of San Juan County, Utah are respected and protected. Friends of Cedar Mesa is the only conservation non-profit exclusively focused on the cultural and natural resources on the public lands of San Juan County. The organization participated actively in the administrative process for both challenged lease sales by filing scoping comments, commenting on the Draft Environmental Assessments, protesting the challenged leasing decision, and serving as a consulting party to BLM during the review process mandated by Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108.

15.     Friends of Cedar Mesa will suffer direct injuries from Defendants' unlawful decision to approve the March and December 2018 Lease Sales without adequately studying the likely harms to historic, cultural, and natural resources.

16.     For example, a core component of Friends of Cedar's mission is improving the visitor experience and public awareness of the cultural and natural resources in San Juan County.

The challenged lease sales will impair these activities by detracting from the aesthetic quality of the landscape and by making it more difficult for the public to experience the cultural landscape as prior cultures would have centuries ago. It will also impair the organization's ability to continue advocating for new protective designations for the lease area, by decreasing its perceived caliber.

17.     Friends of Cedar Mesa also monitors cultural sites in the lease area for looting, vandalism, and damage. New industrial development will increase these threats and require Friends of Cedar Mesa to spend additional resources monitoring access roads, construction sites, and seismic lines. It will also compromise Friends of Cedar Mesa's existing investments in protecting sensitive sites, such as Coal Bed Pueblo and the Bradford Cliff Dwellings site.

18.     Oil and gas leasing will detract from Friends of Cedar Mesa's ability to conduct or facilitate archaeological research in the lease area by destroying surface resources, subsurface deposits, and subtle landscape features, such as ancient roads, hearths, and shrines.

19.     Finally, BLM's failure to engage in adequate tribal consultation for these sales will diminish Friends of Cedar Mesa's ability to continue supporting tribes in protecting sacred sites in the lease area. It is impossible to protect and advocate for cultural resources that went unidentified as a result of BLM's inadequate tribal consultation and site identification efforts. In sum, Defendants' unlawful actions have and will continue to perceptibly impair Friends of Cedar Mesa's existing activities—with a consequent drain on their limited organizational resources— resulting in direct and immediate harm to the organization. A favorable decision by this Court will redress those injuries.

20.     Friends of Cedar Mesa's staff, board members, and supporters will also be adversely affected by the March and December 2018 Lease Sales. They use and enjoy, and

intend to continue using and enjoying, the areas impacted by these lease sales for activities including hiking, backpacking, photography, river running, and observing the area's unique archaeology, geology, paleontology, and wildlife habitat. They derive recreational, spiritual, professional, aesthetic, educational, health, and other benefits and enjoyment from these activities, and they have a great interest in the protection of cultural and natural resources in the leased areas. The construction and operation of wells contemplated by the March and December 2018 Lease Sales will degrade the surface resources, viewsheds, and natural soundscapes of this landscape, thus injuring the continued use and enjoyment of the area by Friends of Cedar Mesa's staff, board members, and supporters. Such injuries will be redressed by the relief sought herein.

21.    Apart from this action, Friends of Cedar Mesa and its staff, board members, and supporters have no adequate remedy at law to address the foregoing injuries to their interests.

22.    Defendant U.S. DEPARTMENT OF THE INTERIOR (DOI) is the federal agency responsible for protecting and managing much of this country's wildlife, natural resources, public lands, and cultural heritage. DOI has nine bureaus, including the U.S. Bureau of Land Management, and is responsible for ensuring that BLM's management of the nation's public lands is in accordance with all applicable laws, including the NHPA, NEPA, and ESA.

23.    Defendant U.S. BUREAU OF LAND MANAGEMENT (BLM) is the agency within the DOI directly responsible for carrying out the Department's obligations under statutes and regulations governing oil and gas exploration, leasing, and development, and for applying and implementing the federal laws and regulations at issue in this Complaint. BLM is the agency that approved the March and December 2018 Lease Sales and issued the underlying NEPA, NHPA and ESA documentation at issue in this case.

24.    Defendant KENT HOFFMAN is sued in his official capacity as Deputy State

Director, Division of Lands and Minerals, of BLM's Utah State Office. Deputy Director Hoffman is responsible for overseeing Utah BLM's minerals program, including the Canyon Country District Office where the challenged parcels are located. He signed the Decision Records, Findings of No Significant Impact, and Protest Decisions for the March and December 2018 Lease Sales.

## LEGAL FRAMEWORK

### A.    National Historic Preservation Act

25.     The National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101–320303, formally recognizes historic preservation as an important policy of the United States.

26.     Its opening passages declare that "(1) the spirit and direction of the Nation are founded upon and reflected in its historic heritage; (2) the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people; (3) the historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency; (4) the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." National Historic Preservation Act § 1, Pub. L. No. 89-665 (Oct. 15, 1966), as amended by Pub. L. No. 96-515 (Dec. 12, 1980).

27.     The NHPA directs the Secretary of the Interior to establish and maintain a National Register of Historic Places (National Register), which are historically significant "districts, sites, buildings, structures, and objects." 54 U.S.C. § 30201. The NHPA also recognizes a special category of nationally-significant historic resources known as National Historic Landmarks. A National Historic Landmark must have national historic significance;

must "possess exceptional value or quality in illustrating or interpreting the heritage of the United States"; must retain a high degree of historic integrity; must be recommended by the National Park System Advisory Board; and may only be designated by the Secretary of the Interior. 36 C.F.R. § 65.4.

28.    Section 106 of the NHPA seeks to protect America's heritage in part by requiring federal agencies to take into account the effect of their "undertakings" on historic properties. *See* 54 U.S.C. § 306108; 36 C.F.R. pt. 800. An important part of this so-called "Section 106" review process is consultation with the appropriate State Historic Preservation Officer (SHPO), Native American tribes, and other interested parties, such as Friends of Cedar Mesa.

29.    The Section 106 process entails four basic steps. First, the responsible agency must "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is the type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An "undertaking" is any "project, activity, or program . . . requiring a Federal permit, license or approval." *Id.* § 800.16(y). A "historic property" is "any prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register [of Historic Places]" ("National Register"). *Id.* § 800.16(l)(1); 54 U.S.C. § 300308.

30.    Second, if the agency undertaking has the potential to affect historic properties, the agency must define the Area of Potential Effects ("APE") for the action. 36 C.F.R. § 800.4. The NHPA regulations define the APE as:

> the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties . . . The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

*Id.* § 800.16(d).

31.    Third, the agency must make a "reasonable and good faith effort" to identify

historic and cultural properties within the APE. *Id.* § 800.4(b)(1). This "may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.* § 800.4(b)(1). The agency must evaluate the National Register eligibility of all sites identified in the APE. *Id.* § 800.4(c). For sites not previously evaluated for National Register eligibility, the agency must "apply the National Register criteria" to determine whether they are potentially eligible for listing. *Id.* "The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible." *Id.*

32.    To be considered eligible for listing on the National Register, a property must possess "integrity of location, design, setting, materials, workmanship, feeling, and association" and meet at least one of four criteria:

> Criterion (a) "are associated with events that have made a significant contribution to the broad patterns of our history"; or
>
> Criterion (b) "are associated with the lives of persons significant in our past"; or
>
> Criterion (c) "embody the distinctive characteristics of a type, period, or method of construction; or that represent the work of a master; or that possess high artistic values; or that represent a significant and distinguishable entity whose components may lack individual significance"; or
>
> Criterion (d) "have yielded, or may be likely to yield, information important in prehistory or history."

536 C.F.R. § 60.4.

33.    Fourth, if the agency finds that eligible properties are present in the APE, it must assess whether the proposed undertaking may cause adverse effects on the identified historic properties, in coordination with consulting parties. 36 C.F.R. §§ 800.4(d), 800.5.

34.    The definition of "adverse effect" is broad. "An adverse effect is found when an undertaking *may* alter, directly or indirectly, any of the characteristics of a historic property that

qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1) (emphasis added). Examples of adverse effects include the "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features," and a "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* 800.5(a)(2).

35.    The Section 106 process concludes with an agency determination of "adverse effect" or "no adverse effect." *See* § 800.5(d)(1).

36.    If the agency reaches a "no adverse effect" finding, it must provide notice and documentation of such finding to all consulting parties. *Id.* § 800.4(d). Consulting parties may object to such a finding, which elevates the consultation process further. *Id.*

37.    If the agency reaches an "adverse effect" finding, it must notify all consulting parties and invite their views to assess adverse effects. *Id.* If adverse effects cannot be resolved, the process is elevated again to the Advisory Council on Historic Preservation (ACHP or "Advisory Council") and the head of the agency undertaking the action. *Id.* § 800.7. Until this process is complete, the undertaking in question cannot go forward.

38.    Agency officials must "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered." *Id.* § 800.1.

39.    They must also "ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis." *Id.* § 800.11(a).

40.    Section 110(f) "does not supersede Section 106, but complements it by setting a

higher standard for agency planning in relationship to [National Historic L]andmarks . . . ." H.R.

Rep. No. 1457, at 36-37 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6401. Congress gave the

Secretary of the Interior (rather than ACHP) authority to promulgate guidelines governing the

implementation of Section 110. The Secretary's guidelines, promulgated through the National

Park Service, confirm that Section 110(f) imposes a higher standard than Section 106: "Section

110(f) of the NHPA requires that federal agencies exercise a higher standard of care when

considering undertakings that may directly and adversely affect NHLs." 63 Fed. Reg. 20496,

20503 (Apr. 24, 1998). The guidelines further direct agencies to "consider all prudent and

feasible alternatives to avoid an adverse effect on the NHL" and specify a three-part balancing

test to be applied whenever such alternatives may appear to "require undue cost" or

"compromise the undertaking's goals and objectives." *Id.*

### B.    National Environmental Policy Act (NEPA)

41.    NEPA is "our basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a). Its twin aims are: (1) to foster informed decisionmaking by requiring agencies to

consider the environmental impacts of their proposed actions; and (2) to ensure that agencies

inform the public that they have considered environmental concerns in their decisionmaking.

42.    To accomplish these objectives, NEPA requires federal agencies to prepare an

Environmental Impact Statement (EIS) to consider the effects of each "major Federal action[ ]

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i).

43.    NEPA's implementing regulations define "effects" to include "historic" and

"cultural" impacts, "whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

44.    To determine whether the impacts of a proposed action are significant enough to

warrant preparation of an EIS, the agency may prepare an Environmental Assessment (EA). The

EA must take a "hard look" at the impacts and include "brief discussions of the need for the proposal, of alternatives . . . , [and] of the environmental impacts of the proposed action and alternatives." *Id.* § 1508.9.

45.    If, after preparing an EA, the agency determines an EIS is not required, it must issue a Finding of No Significant Impact or "FONSI" explaining why the project's impacts are insignificant. *Id.* §§ 1501.4, 1508.9, 1508.13.

46.    An assessment of whether an impact is "significant" must consider the "context and intensity" of the impact. *Id.* § 1508.27. "Context" refers to the setting of the proposed action and "intensity" refers to the severity of the impact. *Id.* § 1508.27(a).

47.    "Intensity" must be evaluated with a host of factors in mind, including but not limited to "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources [and] park lands[,]" "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial[,]" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[,]" "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[,]" and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." *Id.* § 1508.27(b).

48.    An agency must also "rigorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. *Id.* § 1502.14; *see also id.* § 1508.9(b). This

analysis of alternatives is the "heart" of NEPA review. *Id*.

49.     NEPA review must occur at the earliest possible time, 40 C.F.R. § 1501.2, and prior to any irreversible, irretrievable commitment of resources. 40 C.F.R. § 1502.16.

50.     Oil and gas leasing without a No-Surface Occupancy (NSO) stipulation—a stipulation that prohibits occupancy or disturbance on the land surface—is an irretrievable commitment of resources.

        **C.      Endangered Species Act (ESA)**

51.     The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species." 16 U.S.C. § 2(b).

52.     Once species are listed as threatened or endangered by the U.S. Fish and Wildlife Service or National Marine Fisheries Service ("Services"), the Services must designate critical habitat, which is occupied or unoccupied habitat containing physical or biological features essential to the conservation of the species and which may require special management considerations or protection. *Id*. §§ 1532(5), 1533(a)(3).

53.      A federal agency that authorizes, funds, or carries out an activity that "may affect" a listed species must first undertake an inter-agency consultation process to ensure that it does not jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. *Id*. § 1536(a)(2). The threshold for a "may affect" determination is low. This determination is triggered when a listed species is present in the project area.

54.     During the ESA consultation process, if the action agency concludes in a "biological assessment" that the activity is "not likely to adversely affect" the listed species or adversely modify its critical habitat, and the Service concurs with that conclusion, then the

consultation is complete. 50 C.F.R. §§ 402.12, 402.14(b). If, however, the action agency or the Service determines that the activity is "likely to adversely affect" the listed species or its critical habitat, then the Service completes a "biological opinion" to determine whether the activity will jeopardize the species or result in destruction or adverse modification of critical habitat. *Id.* § 402.14. If the Service determines that the action will jeopardize the species or adversely modify critical habitat, it may propose one or more reasonable and prudent alternative actions that would avoid such results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

55.    An agency must request reinitiation of consultation if: (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16.

### D.    Administrative Procedure Act (APA)

56.    Judicial review of agency actions under the NHPA and NEPA are governed by the APA, which provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Review under the APA is further limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

57.    The APA directs courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside where the action is "without observance of

procedure required by law." *Id.* § 706(2)(B)–(F).

### E.    Oil and Gas Leasing on Public Lands

58.    The Mineral Leasing Act (MLA), 30 U.S.C. §§ 181–287, authorizes the Secretary of the Interior to offer certain federal minerals for lease, including oil and gas. The Secretary has delegated this authority to BLM for onshore minerals. *See* 43 C.F.R. § 3100.0-3.

59.    Under the MLA, BLM manages oil and gas drilling on public lands using a three-stage process: (1) land-use planning, (2) parcel nominations and leasing, and (3) permitting of parcel exploration and drilling.

60.    In the first phase, BLM prepares a Resource Management Plan (RMP) in accordance with FLPMA, 43 U.S.C. § 1712, and FLPMA's planning regulations, 43 C.F.R. §§ Part 1600. RMPs generally define the allowable uses of the public lands in the planning area, including which lands may be leased for oil and gas development and under what conditions. An RMP does not mandate leasing any specific lands. BLM must prepare an EIS evaluating the expected environmental impact of potential land management decisions made in RMPs, including oil and gas development. 43 C.F.R. § 1601.0-6.

61.    In the second phase, companies typically nominate through submission of "expressions of interest" public lands for inclusion in an upcoming competitive lease sale. BLM reviews the nominated parcels to determine which parcels to include in the sale. This review process can result in parcel rejections, deferrals, and/or stipulations being placed on the leases to protect the environment or other resource values. *See id.* § 3101.1-3.

62.    The MLA vests BLM with considerable discretion to determine which lands will be leased and does not obligate BLM to offer public lands that operators have nominated.

63.    BLM then offers its chosen parcels in quarterly, competitive lease auctions, in

accordance with 43 C.F.R. Part 3120. If a parcel is nominated and brought to the lease sale but receives no bids, it can be leased non-competitively after the sale. Once issued, a lease is valid for 10 years but can be held indefinitely if it is producing oil or gas "in paying quantities." *Id.* §§ 3120.2-1; 3107.2-1.

64.    The issuance of a lease generally gives the lessee a right to use some of the land for oil and gas development. 43 C.F.R. § 3101.1-2. Issuing leases therefore limits BLM's ability to prohibit oil and gas development altogether on the leased land.

65.    In the third and final phase, the lessee submits an application for a permit to drill (APD) to BLM prior to drilling. 43 C.F.R. § 3162.3-1(c). BLM may impose conditions of approval (COAs) on drilling permits to address site-specific concerns.

## FACTUAL BACKGROUND

### A.    The Historic, Cultural, and Natural Resources of the Lease Parcels and Surrounding Area

66.    The challenged lease parcels are located in Southeastern Utah within BLM's Monticello Field Office of the Canyon Country District of the BLM.



67.     The lease area features some of the highest concentrations of archaeological sites
in the nation. Humans of multiple cultures have inhabited, traversed, and used these lands for
more than 9,000 years and have left evidence of their activities on the landscape in the form of
archaeological sites, buildings, and objects. Chaco-era great houses, community centers, and
pueblos; petroglyphs and pictographs; artifacts; Navajo sweat houses and hogans; kivas;
granaries; shrines; artifacts; and potential segments of the Old Spanish Trail all scatter the
region. Among the most well-known sites are Alkali Ridge, Recapture Canyon, Jenny's Canyon,
Mustang Mesa, and Montezuma Canyon—all harboring a rich and well-preserved record of
Ancestral Puebloan habitation dating back thousands of years.

68.     Alkali Ridge was designated a National Historic Landmark on July 19, 1964.
Alkali Ridge NHL contains archaeological remains of the earliest forms of Puebloan
architecture, including multi-story buildings and kivas representing a period of transition from
scattered, pit-style dwellings to a settled agricultural lifestyle.

69.     In total, over 1,336 historic sites have been recorded on the lease parcels alone, 1,085 of which have been determined eligible for listing on the National Register. Thousands of additional sites are located within just a half mile of the parcel boundaries. BLM itself claims that this landscape contains some "of the highest archaeological site densities in North America." BLM Monticello RMP, Analysis of the Management Situation, at 4-9.

70.     This region also has cultural significance to a variety of Native American peoples. For example, the Pueblo of Acoma traces its ancestral migration path through this region encompassing Bears Ears, Canyon of the Ancients, and Hovenweep National Monuments. The Pueblo of Zuni has identified all ancestral archaeological sites in this region as places of traditional importance because of their association with Zuni ancestors and their oral migration histories. This landscape is also of cultural importance to the Hopi Tribe, which claims cultural affiliation to earlier identifiable cultural groups in Utah and their prehistoric archaeological sites. The Utes also ascribe religious and traditional importance to much of southeastern Utah. All of these cultures maintain that the spirits of their ancestors remain at archaeological sites as long as the sites are not disturbed.

71.     Despite its cultural significance, modern study of this landscape is still in the early stages. Less than 10% of all BLM lands within the Monticello Field Office have been subjected to intensive cultural resource surveys. Thousands of sites remain undocumented. Additionally, most prior cultural resource inventories were driven by Section 106 compliance for specific projects, many of which used outdated methods and thus, produced less reliable results. Current understanding of the numbers, types, and distributions of cultural resources, as well as of prehistoric and historical land use patterns, is therefore based on piecemeal information gleaned from a patchwork of small, disjointed surveys conducted with questionabl methods.

72.     Utah's Canyon Country District is also notable for its natural resources. The lease parcels possess scenically unique vistas; colorful sandstone cliffs and twisting canyons; and diverse vegetation ranging from aspen, pinyon, and juniper, to cottonwood and cacti. These lands support an array of threatened and endangered wildlife species, including the Mexican spotted owl, Southwestern willow flycatcher, and Yellow-bill cuckoo. Several parcels lie atop or drain into the San Juan River, which provides critical habitat for the endangered humpback chub, Colorado pikeminnow, bonytail, and razorback sucker (collectively, "Colorado River fishes").

73.     Given its wilderness characteristics, unique topography, and cultural history, this region is also a burgeoning recreation destination, helping to drive the State of Utah's $12 billion outdoor recreation economy. The parcels are also nestled between world-class protected areas, including Hovenweep, Canyons of the Ancients, and Bears Ears National Monuments; and Alkali Ridge National Historic Landmark.

74.     In February 2015, BLM considered leasing parcels in this area for oil and gas development, many directly adjacent to or overlapping the challenged lease parcels. Numerous conservation groups and Native American tribes formally protested that February 2015 Lease Sale, citing potential conflicts with cultural resources. The National Park Service also expressed concerns about adverse effects on Hovenweep National Monument's world-famous night skies, natural soundscapes, and scenic views. BLM ultimately deferred 36 of the 53 parcels proposed for the sale, specifically citing likely adverse effects on cultural resources and BLM's lack of adequate information on cultural resources.

75.     The Trump Administration abruptly shifted course and resumed leasing in this contested area without completing the additional analysis and planning BLM previously deemed necessary.

B.    **Individual Lease Sales**

March 2018 Lease Sale

76.    BLM held a lease sale on March 20, 2018, offering 43 leases across southeastern Utah, including 21 parcels in the culturally-rich Monticello Field Office. BLM segmented its NEPA analysis for the sale into two separate documents: (i) a Determination of NEPA Adequacy (DOI-BLM-UT-Y010-2017-0285-DNA) covering 14 parcels in BLM's Moab Field Office that were previously evaluated in the Moab Master Leasing Plan; and (ii) an Environmental Assessment (EA) (DOI-BLM-UT-Y010-2017-0240-EA) (hereinafter, "March 2018 Lease Sale EA") covering 29 parcels not encompassed in the Master Leasing Plan, including 21 parcels in the Monticello Field Office and 8 parcels in the Moab Field Office. The March 2018 Lease Sale EA discusses only two alternatives: the no-action alternative (offering no leases), and the proposed action (offering all leases). BLM failed to consider any middle-ground alternative that would avoid or mitigate impacts to cultural and environmental resources.

77.    BLM also prepared a Cultural Resources Review to analyze the potential impacts of the March 2018 lease sale (hereinafter, "March 2018 Cultural Resources Review"). That document identified a total of 821 National Register-eligible sites within the 21 Monticello parcels, and 1,961 sites within a 0.5-mile buffer of these parcels. Only 30% of the parcel acreage had ever been surveyed. Much of the unsurveyed land has a "high" potential for unidentified cultural resources, according to BLM's models. BLM acknowledged that development of the leases "has the potential to impact cultural resources" through physical disturbance, dust exposure, increased vandalism and looting, and changes to the landscape's historic setting and feeling. Nonetheless, BLM determined that such impacts "do no [sic] reach the significant, or adverse effects, threshold." This finding was premised on the unsupported assertion that a

typically-sized development project could be sited somewhere on each parcel without impacting historic sites.

78.    Native American tribes, the National Park Service, local officials, and environmental groups all heavily criticized BLM's analysis for inadequately considering potential impacts to cultural and environmental resources. The Hopi Tribe requested that BLM defer certain parcels from the lease sale, noting its cultural affiliation with the area and advising BLM that the sale would adversely affect cultural resources significant to the tribe.

79.    The National Park Service expressed specific concerns regarding impacts to Hovenweep National Monument—including the potential degradation of the Monument's scenic views, dark night skies, and natural soundscapes—and requested that BLM defer 13 parcels near the Monument.

80.    Friends of Cedar Mesa also timely submitted comments to BLM during the NEPA process, raising concerns over cultural resource impacts and urging BLM to defer the most culturally sensitive parcels. Friends of Cedar Mesa also participated as an NHPA Section 106 consulting party, including by timely submitting comments on the draft Cultural Resources Review and a letter of disagreement with BLM's "No Adverse Effect" determination. On January 2, 2018, Friends of Cedar Mesa timely filed a formal protest against the March 2018 Lease Sale, raising issues similar to those identified in its prior comments.

81.    BLM made no substantive revisions to address the concerns of tribes, the National Park Service, Friends of Cedar Mesa, and other interested parties.

82.    BLM also ignored its obligation under the Endangered Species Act to prepare a Biological Assessment or consult with the U.S. Fish and Wildlife Service over the March 2018 Lease Sale, despite its acknowledgement that several threatened and endangered species are

likely to occur in the lease area—including Southwestern willow flycatcher, Mexican spotted owl, and Yellow-billed cuckoo. BLM did not determine that the proposed leasing would have "no effect" on these listed species, as required to side-step Section 7 consultation requirements. BLM also failed to discuss the possible presence of Colorado River fishes.

83.     On May 17, 2018, Defendant Kent Hoffman issued his Decision Record approving the lease sale decision and a signed FONSI.

84.     On October 25, 2018, Friends of Cedar Mesa sent BLM notice of its intent to sue BLM for violations of the Endangered Species Act.

December 2018 Lease Sale

85.     BLM held the second challenged lease sale on December 20, 2018, offering 19 parcels in the Monticello Field Office. Plaintiffs specifically challenge BLM's decision to offer 11 of those parcels.

86.     Rather than prepare an EA to analyze the sale's impacts, BLM relied a cursory Determination of NEPA Adequacy ("DNA") which asserted that prior programmatic EISs and the March 2018 Lease Sale EA sufficiently evaluated the effects of the December 2018 lease sale—even though the two sales involved entirely different parcels.

87.     BLM did not provide an opportunity for public comment on the December 2018 Lease Sale DNA and did not publicly release the DNA until issuing its Notice of Competitive Lease Sale, which immediately commenced a 10-day protest period.

88.     BLM also conducted a highly abbreviated Section 106 review process for the December 2018 lease sale, which again determined that the sale would have "No Adverse Effect" on any historic resources in the lease area. The cultural resources report identified a total of 447 National Register-eligible sites within the lease parcels, and 1,305 sites within a 0.5-mile

buffer of these parcels. Only 17% of the parcel acreage had ever been surveyed. Much of the unsurveyed acreage has a "high" potential for unidentified cultural resources, according to BLM's own models.

89.     Several tribes, including the Pueblo of Acoma and Pueblo of Santa Clara, submitted comments noting their deep cultural affiliation to the lease area, requesting additional efforts to identify traditional cultural properties, and seeking government-to-government consultation. The Hopi Tribe again requested that BLM defer certain parcels from the lease sale.

90.     Friends of Cedar Mesa also participated as a Section 106 party by timely commenting on the draft Cultural Resources Report. Friends of Cedar Mesa timely filed a protest of the proposed December 2018 sale and letter of disagreement with BLM's finding of "No Adverse Effect." These submissions raised concerns with BLM's use of a DNA and reiterated prior concerns with BLM's failure to adequately identify and evaluate effects to sensitive historic resources, among other issues. BLM again failed to address the concerns of the tribes, Friends of Cedar Mesa, and other commenters about the scale of unidentified cultural resources and potential for adverse effects.

91.     Defendant Kent Hoffman issued his Decision Record approving the lease sale on February 8, 2019.

**C.     Common Deficiencies in BLM's NHPA, NEPA, and ESA Compliance**

92.     BLM's March and December 2018 Utah Lease Sales place at risk a remarkable concentration of archaeological, cultural, and natural resources. The agency's process for considering such impacts was legally deficient in multiple respects.

    a.     Arbitrary and Capricious Definition of "Area of Potential Effects"

93.     The NHPA requires agencies to delineate an Area of Potential Effects (APE) for

each undertaking, defined as the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." *Id.* § 800.16(d). Importantly, the APE should encompass "visual, atmospheric or audible" intrusions that may adversely impact a site's setting, feeling, and association. *Id.* § 800.5(a)(2)(iv), (v).

94.    BLM defined the APE for the Lease Sales to include only the individual lease parcel boundaries plus a ½-mile buffer immediately surrounding each parcel.

95.    BLM failed to offer a rational explanation for its delineation of the APE, and record evidence demonstrates that this APE does not fully account for the likely "visual, atmospheric, and audible" intrusions and other indirect effects of oil and gas leasing.

96.    As for potential visual impacts, BLM assumed that vegetation, topography, and other modern development would camouflage all well facilities such that they would not be visible outside of a ½-mile radius.

97.    BLM offered no factual justification for this assumption and ignored record evidence demonstrating the assumption's inaccuracy. For example, Friends of Cedar Mesa prepared and submitted a viewshed analysis for the March 2018 lease sale, which showed that viewsheds for some historic resources extended many miles beyond BLM's preferred ½-mile buffer.  In fact, BLM's own viewshed analysis confirmed these conclusions, noting that oil and gas development would be visible to a casual observer at archaeological sites miles from each parcel. *See* Final EA at 50–65.

98.    BLM also exaggerated the extent of existing human degradation in the area and the extent to which future oil and gas development would blend into the existing landscape, while simultaneously downplaying its earlier finding that the landscape retains "high scenic quality." BLM also failed to incorporate or respond to Friends of Cedar Mesa's photographic

evidence showing the natural, undisturbed vistas surrounding key historic sites. This photographic evidence demonstrates that oil and gas development would starkly contrast with the existing landscape.

99.    As for potential auditory impacts, BLM provided no evidence or analysis to support its assertion that topographic complexity and well placement would ameliorate noise impacts beyond (or within) the ½-mile buffer, and record evidence suggests that sounds will travel much farther in this terrain.

100.    Additionally, the APE fails to examine other indirect effects attributable to access roads and pipelines that would be needed to serve the lease parcels. Industrial traffic associated with oil and gas operations can generate substantial amounts of windblown dust that has been shown to obscure and deteriorate rock art. Road construction and improvement would also increase public access to sensitive cultural resources, which BLM's own research suggests will increase looting and vandalism. By limiting the APE to an artificially constructed buffer around the lease parcels, BLM fails to account for these indirect impacts which could occur well beyond BLM's chosen ½-mile buffer.

101.    In sum, BLM failed to articulate a rational basis for its choice of APE, failed to consider all indirect effects in setting the APE, and reached a decision which runs counter to the evidence before the agency.

        b.    <u>Failure to Make a Reasonable and Good Faith Effort to Identify Historic Properties</u>

102.    Under the NHPA, BLM is required to make a "reasonable and good faith effort" to identify the historic properties in the APE that may be impacted by its undertaking. 36 C.F.R. § 800.4(b)(1). This "may include background research, consultation, oral history interviews, sample field investigation, and field survey." 36 C.F.R. § 800.4(b)(1).

103.    BLM uses three types of inventories to identify the cultural resources within a geographic locale: (1) Class I review of all existing literature and information on historic properties in the project area; (2) Class II inventories that involve targeted or sample field investigations to project the probable density, diversity, and distribution of historic properties in the project area; and (3) Class III inventories that intensively survey the project area to identify and evaluate the historic properties. *See* BLM Manual MS-8110 at 8110. 21.

104.    BLM "most frequently" prepares a Class III inventory in meeting its Section 106 obligations. *See id.* The BLM Manual 8110 on "Identifying and Evaluating Cultural Resources" states that "[i]n a previously unsurveyed area of potential effect, a class III (intensive) survey is generally required when a proposed undertaking would substantially disturb the land surface" or "affect the integrity of historic properties." *See id.* at 8110.23(A).

105.    For each of the Lease Sales, BLM relied on a Class I literature review and modeling to predict the probability that unidentified cultural resources are located within the APE, based on the limited existing survey data. BLM's models predicted high and medium probabilities across large swaths of the lease area, suggesting a high likelihood that ground surveys would discover additional eligible properties in the lease area.

106.    Despite the low survey coverage, and the high likelihood that unidentified historic properties are present in the lease area, BLM refused to perform any Class II or Class III inventories before approving the sale. As a result, roughly 75% of the lease area has *never* been surveyed for cultural resources. Existing survey coverage ranges by parcel from 0% to 95%, figures which are likely exaggerated by BLM's unsupported assumption that older surveys followed today's standard survey practices.

107.    BLM also failed to meaningfully incorporate GPS data and other cultural resource

information provided by consulting parties about the locations of known sites not included in BLM's draft Cultural Resources Report.

108.    Individually and collectively, these failures demonstrate that BLM failed to make a reasonable and good faith effort to identify the eligible cultural sites within the APE.

### c.    Failure to Engage in Meaningful Tribal Consultation

109.    The NHPA requires federal agencies, in carrying out their Section 106 obligations, to "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii).

110.    The NHPA regulations further specify that such consultation must provide tribes a reasonable opportunity to identify their concerns about historic properties; advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance to them; articulate their views on the undertaking's effects on such properties; and to develop and evaluate alternatives that could avoid, minimize, or mitigate adverse effects on historic properties. *See* 36 C.F.R. § 800.4–.6.

111.    The ACHP handbook on "Consultation with Indian Tribes in the Section 106 Review Process" clarifies that "[c]onsultation constitutes more than simply notifying an Indian tribe about a planned undertaking. The ACHP views consultation as a process of communication that may include written correspondence, meetings, telephone conferences, site visits, and e-mails."

112.    When consulting regarding the existence of traditional cultural properties, the Tenth Circuit has specifically held that "a mere request for information" from the tribes is not sufficient to meet BLM's section 106 consultation duties where communications from the tribes suggest the existence of unidentified sites. *See Pueblo of Sandia v. United States*, 50 F.3d 856,

860 (10th Cir. 1995). An agency's failure to engage in its own further investigations to follow up

on such information violates the NHPA. *Id.* at 861 – 62 ("The information communicated to the

Forest Service . . . clearly suggest that there is a sufficient likelihood that the canyon contains

traditional cultural properties to warrant further investigation. We thus hold that the Forest

Service did not make a reasonable effort to identify historic properties.").

113.    Here, interested tribes, including the Pueblo of Acoma, indicated to BLM that the

lease sale area was likely to contain traditional cultural properties that prior surveys and studies

had not identified. Acoma requested that BLM engage in further efforts to identify such sites,

such as through oral interviews with Acoma representatives, field investigations, or ethnographic

study.

114.    BLM refused to undertake these or any other reasonable efforts to investigate the

presence of unidentified traditional cultural properties in the lease area, in violation of its tribal

consultation obligations and duty to make "reasonable and good faith effort" to identify historic

properties in the lease area.

d.    Failure to Make National Register Eligibility Determinations

115.    Under the NHPA, BLM is also required to apply the National Register eligibility

criteria to potential historic properties identified in the APE. 36 C.F.R. § 800.4(c)(2). Even for

previously-evaluated properties, "[t]he passage of time, changing perceptions of significance, or

incomplete prior evaluations may require the agency official to reevaluate" a prior eligibility

determination. *Id.* BLM evaded this essential step of the Section 106 process in at least two

distinct ways.

116.    First, BLM refused to consider whether areas identified by Friends of Cedar

Mesa, within the immediate vicinity of the proposed leases, were eligible for listing as National

Register "districts." These include Recapture/Mustang District, Alkali Ridge District, and Montezuma Canyon District. The record shows that these areas include large and interconnected prehistoric community centers, with groupings of both small and large sites that share common archaeological and cultural components, yet BLM never considered their interconnected nature or potential eligibility as National Register districts.

117.    BLM also failed to reevaluate outdated, incomplete, or inaccurate eligibility determinations that assigned National Register Criterion D ("information potential") to sites without having first considered whether Criterion A, B, or C might be more appropriate. In comments, Friends of Cedar Mesa and others noted that many sites should be evaluated under these more protective criteria because of their size, complexity, and significance. BLM never responded to such comments.

118.    BLM's failure to make these requisite eligibility determinations fatally undermined its subsequent finding of No Adverse Effect, as National Register Districts and Criterion A, B, and C sites require a more intensive analysis of adverse impacts. In particular, BLM has previously acknowledged that historic districts are more susceptible to setting and feeling impacts than the individual sites they contain.

   e. <u>Failure to Address the National Park Service's Concerns Regarding Impacts to Hovenweep National Monument</u>

119.    The National Park Service (NPS) submitted comments to BLM regarding the potential impacts to Hovenweep National Monument, which is a designated International Dark Sky Park, including: (1) a reduction in air quality; (2) an increase in roads, well pads, and associated dust from vehicle traffic; (3) adverse effects on scenic views and visual resources; (4) a reduction in the quality of dark night skies; (5) a reduction in the quality of natural soundscapes; and (6) adverse effects on the quantity and quality of groundwater resources.

120.    Other groups echoed these concerns about light and noise impacts on Hovenweep National Monument.

121.    Despite these serious and considered comments, BLM failed to conduct any analysis of the potential impacts to night sky and soundscape qualities of Hovenweep National Monument.

f.   Arbitrary and Capricious "No Adverse Effect" Determination

122.    BLM's conclusion that each lease sale had no potential to adversely affect cultural resources was also arbitrary and capricious, as it runs contrary to the evidence in the record, fails to consider important aspects of the problem, and is an unexplained contradiction of BLM's own prior conclusion for a February 2015 lease sale in this same region.

123.    First, BLM based each No Adverse Effect determination largely on an unsubstantiated assertion that there was space within each parcel to accommodate 10 acres of surface development without harming historic resources. Despite multiple consulting party requests, BLM failed to reveal its methodology for making this determination, violating its obligation to "ensure that a [Section 106] determination . . . is supported by sufficient documentation to enable any reviewing parties to understand its basis." 36 CFR § 800.11

124.    Second, BLM failed to meaningfully address the potential visual impacts to the setting and feeling of listed and eligible historic sites. The agency failed to perform viewshed analyses for most National Register eligible sites, despite its own admission in the Cultural Resources Report for the February 2015 Utah lease sale that setting and feeling impacts must be assessed with a visual analysis. BLM also failed to consider that many historic sites were intentionally situated on hilltops to achieve maximum visibility of the terrain below, undermining its assumption that viewshed impacts "can be avoided through judicious well pad

placement."

125.    Third, BLM entirely ignored other foreseeable effects to historic properties, such as auditory impacts to the setting and feeling of historic sites; vandalism and looting resulting from improved public access; and increased rock art exposure to harmful dust resulting from increased traffic on roads.

126.    Fourth, without any supporting evidence or explanation, and contrary to its own research in the area, BLM asserted that previous leasing has not adversely affected historic resources. Friends of Cedar Mesa provided extensive evidence to BLM showing that existing pumpjacks and storage tanks in the region can be seen and heard from historic sites, which adversely affects the setting and feeling of these resources. BLM failed to respond to this showing.

127.    Finally, BLM relied heavily on the availability of protective lease stipulations to avoid adverse effects, never considering that these stipulations are discretionary and subject to broad exceptions. Unlike "No Surface Occupancy" stipulations, which permit BLM to bar all exploration and development of a parcel, BLM's cultural stipulations do not allow BLM to prohibit development of a parcel altogether, even where necessary to avoid impacts to cultural resources. These lease stipulations therefore do not provide a basis for BLM's No Adverse Effect determination.

128.    BLM's No Adverse Effect determinations are especially problematic where the agency came to a starkly different conclusion for a prior lease sale in the same area. In February 2015, BLM proposed leasing parcels in essentially the same area, many directly adjacent to or overlapping the challenged lease parcels. *See supra* ¶ 74. BLM concluded that leasing would likely result in adverse effects to the most culturally dense parcels and ultimately deferred 36 of

the 53 parcels proposed for the sale. As Friends of Cedar Mesa commented, the site densities of most of the challenged lease parcels exceed those of the 2015 lease parcels. Nothing has changed since 2015 to decrease the likelihood of adverse effects.

129.    For all these reasons, BLM's No Adverse Effect determination was arbitrary, capricious, and contrary to law. Moreover, because BLM reached a No Adverse Effect finding, it failed to take further steps required under the NHPA, such as working with consulting parties to develop mitigation measures.

g.    Failure to Minimize Harm to Alkali Ridge National Historic Landmark

130.    Several of the challenged lease parcels are located immediately adjacent to the Alkali Ridge National Historic Landmark. The available record suggests that development on adjacent parcels would be visible from Alkali Ridge NHL, detracting from its natural setting and feeling.   As BLM itself conceded, oil and gas development in the lease area has the potential to cause "changes to the landscape which result in impacts to a [cultural] site's setting, feeling, or association; increased rock art exposure to dust resulting from increased traffic on roads; . . . and the potential to increase public access, potentially leading to increased vandalism and looting."

131.    Under Section 110(f) of the NHPA, BLM was under a heightened obligation (1) to minimize harm to Alkali Ridge National Historic Landmark to the maximum extent possible; and (2) to consider all prudent and feasible alternatives to avoid adverse impacts on Alkali Ridge NHL.

132.    BLM failed to adhere to this heightened standard of care, instead taking position that Section 110(f) was inapplicable. BLM argued that the undertaking "cannot reach the 'directly and adversely affected' threshold" of Section 110(f) because there was no potential for direct surface disturbance of Alkali Ridge NHL itself. This cramped interpretation of the NHPA

has been previously rejected as contrary to the plain language of the statute. Section 110(f) encompasses adverse visual or auditory effects—like those anticipated here—that are a direct result of the proposed undertaking.

133.    BLM's error of law, and its failure to comply with Section 110(f) heightened standard of care, rendered its leasing decisions arbitrary, capricious, and contrary to law.

h.    Failure to Consider a Reasonable Range of Alternatives

134.    NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(C)(iii), 4332(E); *see also* 40 C.F.R. § 1508.9.

135.    BLM considered only a "no action" and a "leasing" alternative in approving the challenged lease sales. It summarily rejected the "no action" alternative, after determining that it "would not comply with Mineral Leasing Act's requirement for each State to hold quarterly lease sales." This decision was legally incorrect as the Mineral Leasing Act only requires BLM to hold quarterly lease sales where parcels are *available* for leasing, 30 U.S.C. § 226(b)(1)(A), and BLM is not required to make available any of the nominated lease parcels. Therefore, the no action alternative would not violate the MLA's quarterly lease sale requirement.

136.    BLM also failed to consider any alternatives in between "leasing" and "no-leasing," including partial deferrals or additional stipulations to protect sensitive resources. For example, commenting parties—including BLM's sister federal agency, the National Park Service—requested that BLM consider various alternatives that would defer or impose NSO stipulations on culturally or ecologically sensitive parcels. BLM summarily rejected each proposed alternative without providing a rational explanation.

a. Failure to Consider the Cumulative Effects of the Lease Sales and Other Threats to Cultural Resources, Such as Climate Change

137. BLM had a NEPA duty to evaluate the cumulative impacts of each lease sale "when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. A NEPA cumulative impact analysis must identify other past, present, and reasonably foreseeable threats to the affected resources; describe their impacts; and analyze the combined impact of the proposed action when added to these other threats.

138. The March 2018 lease sale EA ostensibly discusses the cumulative impacts on cultural resources, but this cursory one-paragraph analysis fails to meet BLM's "hard look" duty. The only other "past, present, and reasonably foreseeable" action BLM identified was "recreational activities," and BLM failed to actually describe the impacts of recreation on cultural resources—alone or in combination with oil and gas development. For example, BLM ignored how road construction associated with oil and gas development might increase recreational use in the lease areas, and attendant risks of cultural resource looting and vandalism.

139. BLM also utterly ignored the cumulative impacts of climate change on cultural resource degradation. Numerous commenters, including Friends of Cedar Mesa, noted that climate change trends will impact both exposed and buried cultural resources by increasing erosion, flooding, dust deposition, wildfire, and thermal stress—all of which are known to deteriorate cultural resources. BLM failed to acknowledge or study these cumulative climate-related impacts on cultural resources, in both the March 2018 lease sale EA and its 2021 Supplemental EA on climate change.

b. Failure to Initiate and Reinitiate ESA Consultation over Impacts to Listed Species

140. The ESA requires BLM to consult with the U.S. Fish and Wildlife Service if any

action "may affect" a threatened or endangered species. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.12.

141.    BLM violated this duty for the March 2018 lease sale, as it failed to make a threshold determination as to whether its oil and gas leasing decision would fall below the statutory "may affect" standard requiring consultation over the potential impacts of leasing on Mexican spotted owl, Southwestern willow flycatcher, Yellow-billed cuckoo, and the Colorado River fishes.

142.    BLM instead relied on a 2008 programmatic consultation regarding the Monticello Resource Management Plan to meet its ESA obligations for Mexican spotted owl, Southwestern willow flycatcher, and Colorado River fishes. During this earlier consultation, BLM acknowledged that oil and gas leasing and other actions approved under the Monticello Resource Management Plan "may affect" and were "likely to adversely affect" these listed species. To avoid a jeopardy finding—which would have required modifying or abandoning certain actions permitted in the RMP—BLM agreed to a series of monitoring requirements and resource protection measures for all subsequent implementation decisions, including oil and gas leasing. BLM failed to adhere to the monitoring and protective measures, thus foreclosing reliance on this dated consultation for ESA coverage.

143.    BLM also violated the ESA in refusing to initiate consultation over the potential impacts of oil and gas leasing on the Yellow-billed cuckoo, which was only listed as a threatened species in 2014 and was not included in the 2008 consultation. An agency is required to initiate or reinitiate consultation if a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16. BLM has failed to reinitiate consultation over the impacts of continued implementation of the Monticello RMP on the cuckoo, and BLM

has similarly failed to consult over the impacts of its March 2018 oil and gas leasing decision on the cuckoo, in violation of the ESA.

**D.      Prior Litigation, Temporary Lease Suspensions, and Supplemental EA**

144.     Friends of Cedar Mesa originally filed suit over the March 2018 lease sale in February 2019 (Case No. 4:19-cv-00013-DN). In April 2019, the Southern Utah Wilderness Alliance initiated a separate action challenging both the March 2018 and December 2018 lease sales. The two cases were consolidated on May 6, 2019.

145.     On July 19, 2019, in *WildEarth Guardians v. Zinke*, No. 1:16-cv-01724-RC, 2019 WL 3253685 (D. D.C. July 19, 2019), the District Court for the District of Columbia determined that the BLM did not adequately assess potential impacts of greenhouse gas (GHG) emissions and climate change under NEPA for oil and gas leases sold in Wyoming. In light of that decision, BLM voluntarily suspended 243 leases issued in 14 Utah lease sales, including the March 2018 and December 2018 sales, pending further NEPA analysis on GHG emissions and climate change.

146.     In light of those lease suspensions, on August 8, 2019, BLM filed a motion to dismiss the consolidated cases by Friends of Cedar Mesa and the Southern Utah Wilderness Alliance as moot. *See* Case No. 4:19-cv-00013-DN, Docket No. 40. The Court granted the motion and dismissed the cases without prejudice. *See* Case No. 4:19-cv-00013-DN, Docket No. 51.

147.     BLM subsequently circulated for public comment a draft supplemental EA on the potential GHG emissions that may result from the development of the parcels offered at the 14 Utah lease sales. Friends of Cedar Mesa timely submitted comments raising, among other issues, concerns that BLM failed to analyze the impacts of change on cultural resource degradation—

including by dust, erosion, wildfire.

148.    On January 14, 2021, BLM issued its Final Supplemental EA ("Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah") and associated FONSI. The EA made no substantive revisions to address the climate-related cultural resource impacts raised by Friends of Cedar Mesa. That same day, BLM issued a series of decisions lifting the suspensions on all 243 leases, effective February 1, 2021.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the NHPA and APA)

149.    Plaintiff incorporates by reference all preceding paragraphs.

150.    BLM's approval and issuance of the challenged oil and gas lease sales and leases constitutes an undertaking under the NHPA that has the potential to affect historic properties.

151.    BLM's Section 106 processes and associated Cultural Resources Reviews for the challenged lease sales violated the NHPA in the following ways, each of which is a distinct and separate violation of law:

a.    BLM's APE for each challenged lease sale was arbitrarily defined and excluded many historic properties that could be affected by the undertaking;

b.    BLM failed to make a reasonable and good faith effort to identify historic properties within this Area of Potential Effects prior to approving each challenged lease sale;

c.    BLM failed to consider information provided by consulting parties about the nature and location of potentially eligible historic resources;

d.    BLM failed to conduct eligibility determinations of potentially National Register-eligible districts and landscapes identified during the Section 106 process;

e.  BLM failed to reevaluate outdated, incomplete, or inaccurate eligibility
determinations;

f.  BLM's Cultural Resources Reviews failed to acknowledge or adequately analyze
the probable adverse effects of the challenged lease sales on historic properties;

g.  BLM's determinations of No Adverse Effect relied on unsupported assumptions,
instead of substantive analysis, and ignored several potential adverse effects
raised by commenters, such as the impacts of dust on rock art and the potential for
improved road access to increase increased looting and vandalism;

h.  BLM failed to provide sufficient information to allow consulting parties, tribes,
and the public to understand the basis for its No Adverse Effect findings;

i.  BLM disregarded its own prior determination that oil and gas leasing in this
landscape would likely result in adverse effects to historic resources; and

j.  BLM failed to engage in meaningful tribal consultation.

152.    In addition, BLM (i) failed to undertake to the maximum extent possible the
planning and actions necessary to minimize harm to Alkali Ridge National Historic Landmark;
(ii) failed to consider all prudent and feasible alternatives to avoid an adverse effect on Alkali
Ridge National Historic Landmark; and (iii) failed to undertake the three-part analysis required
by Section 110(f) before eliminating alternatives from consideration.  Each of these failures was
arbitrary, capricious, an abuse of discretion, and a violation of law.

153.    These failures, in turn, prevented BLM from taking further steps required under
the NHPA, such as identifying avoidance or mitigation measures.

154.    For the foregoing reasons, BLM's authorization of the challenged lease sales and
issuance of the challenged leases is arbitrary, capricious, an abuse of discretion, and not in

accordance with law under the NHPA, APA, and their implementing regulations.

**SECOND CLAIM FOR RELIEF**
**(Violation of NEPA and the APA – Failure to Prepare an EIS)**

155.    Plaintiff incorporates by reference all preceding paragraphs.

156.    NEPA requires the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

157.    BLM's decisions to offer tens of thousands of acres for oil and gas development, in an area filled with important cultural and ecological resources, is a major federal action with the potential to significantly affect the quality of the human environment.

158.    Numerous factors requiring preparation of an EIS are present here. Among these are the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands," "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[,]" "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973," and the controversial and uncertain nature of the likely effects. 40 C.F.R. § 1508.27(b). The presence of any of these factors renders BLM's decision to not prepare an EIS arbitrary, capricious, and contrary to law.

159.    For all these reasons, BLM's Finding of No Significant Impact (FONSI), Determination of NEPA Adequacy, and decisions to forego preparing an EIS before approving each challenged lease sale, were arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, within the meaning of the judicial review provisions of the APA, and must be held unlawful and set aside under 5 U.S.C. §

706.

## THIRD CLAIM FOR RELIEF
### (Violation of NEPA and the APA – Preparation of an Unlawful EA and DNA)

160.     Plaintiff incorporates by reference all preceding paragraphs.

161.     Pursuant to NEPA and its implementing regulations, BLM must take a "hard look" at the direct, indirect, and cumulative environmental impacts of a proposed action before the agency makes any irreversible and irretrievable commitment of resources.

162.     The issuance of an oil and gas lease without a No Surface Occupancy (NSO) Stipulation is an irreversible and irretrievable commitment of resources.

163.     NEPA also requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

164.     BLM failed to take the requisite hard look at the direct, indirect, and cumulative impacts of the challenged lease sales on cultural and natural resources, in violation of the "hard look" requirements of NEPA and its implementing regulations.

165.     BLM arbitrarily and capriciously eliminated from consideration all reasonable alternatives between the "leasing" and "no-leasing" extremes, including those raised by commenting parties. BLM also offered a legally erroneous conclusion for its rejection of the "no action" alternative, thereby foreclosing any meaningful consideration of that alterative.

166.     BLM also failed to prepare *any* environmental analysis for the December 2018 sale, instead relying on a DNA worksheet that arbitrarily concluded that the analysis from the Monticello RMP EIS and March 2018 lease sale EA already adequately addressed the environmental effects of

167.     For the foregoing reasons, BLM's preparation and approval of the Final EA and

FONSI or DNA and Decision Record for each challenged lease sale was arbitrary, capricious, and not in accordance with NEPA, the APA, or their implementing regulations.

## FOURTH CLAIM FOR RELIEF
### (Violation of ESA and the APA – Failure to Consult)

168.    Plaintiff incorporates by reference all preceding paragraphs.

169.    Section 7(a)(2) of the ESA requires agencies to consult with the U.S. Fish and Wildlife Service before taking an action that "may affect" a listed species or the species' critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

170.    BLM's approval of the March 2018 Lease Sale is an action that "may affect" Mexican spotted owl, Southwestern willow flycatcher, Yellow-billed cuckoo, and the Colorado River fishes, and their critical habitats. Accordingly, BLM is required to consult with the U.S. Fish and Wildlife Service to ensure that its oil and gas leases will not jeopardize any listed species or adversely modify critical habitat.

171.    BLM's failure to consult with the Service prior to approving the March 2018 Lease Sale violates its section 7 duty to consult under the ESA.

172.    BLM's approval and issuance of the March 2018 Lease Sale without first completing consultation violates the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, and is arbitrary, capricious, and not in accordance with law, 5 U.S.C. §§ 701-706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

(1)    Declare that Defendants violated the NHPA, NEPA, ESA, APA, and/or their implementing regulations in approving the March and December 2018 Lease Sales;

(2)    Declare unlawful and vacate the March 2018 Lease Sale EA and FONSI, December 2018 DNA, and Decision Records and Cultural Resources Reviews for both sales;

(3)    Reverse and set aside any leases, permits, or approvals issued in reliance on the foregoing March and December 2018 Lease Sale documents or decisions;

(4)    Enter such preliminary and/or permanent injunctive relief as Plaintiff may pray for hereafter;

(5)    Award Plaintiff's costs incurred in pursuing this action, including attorney's fees, as authorized by the Endangered Species Act, 16 U.S.C. § 1540(g)(4), Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and

(6)    Grant such other and further relief as the Court deems just and proper.


Dated: April 8, 2021                    Respectfully submitted.

                                        /s/ Todd C. Tucci
                                        Todd C. Tucci (DC Bar # ID0001)
                                        Sarah Stellberg (Idaho Bar # 10538, *pro hac vice application forthcoming*)
                                        ADVOCATES FOR THE WEST
                                        P.O. Box 1612
                                        Boise, ID 83702
                                        (208) 342-7024
                                        ttucci@advocateswest.org
                                        sstellberg@advocateswest.org

                                        *Attorneys for Plaintiff*
                                        *Friends of Cedar Mesa*